T.C. Memo. 2012-152

UNITED STATES TAX COURT

JOSEPH MOHAMED, SR. AND SHIRLEY MOHAMED, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 13947-07, 12882-08.          Filed May 29, 2012.

<u>Robin Lesley Klomparens</u> and <u>Douglas L. Youmans</u>, for petitioners.

<u>Daniel J. Parent</u>, for respondent.

MEMORANDUM OPINION

HOLMES, <u>Judge</u>: Joseph and Shirley Mohamed donated extremely valuable

real estate to charity in 2003 and 2004, but didn't follow the Commissioner's

directions about how to document their donations. Even though the property was

quite likely more valuable than the Mohameds reported on their tax returns, the

Commissioner moved for partial summary judgment to deny them any deduction at all because of their failure to follow the regulation. The Mohameds reply that such a harsh result must mean that the regulation is invalid; or, if not invalid, should at least be read to imply an exception for substantial compliance--especially since, they argue, this problem was caused by the Commissioner himself, whose design of a tax form actively misled them.

## Background[1]

Joseph Mohamed, Sr., is a real-estate broker, a certified real-estate appraiser, and a prominent Sacramento entrepreneur. During a long career he has amassed a fortune in real estate. He and his wife Shirley wanted to put their wealth to good use, and in 1998 they formed The Joseph Mohamed, Sr. and Shirley M. Mohamed Charitable Remainder Unitrust II. A charitable remainder unitrust, or CRUT, is a special kind of trust that allows taxpayers to claim an immediate deduction for a portion of the value of property settled in a trust, whose income goes to the donor for life or for a term not to exceed 20 years with the remainder to charity.[2] The

---

[1] Because the summary judgment motions are the Commissioner's, the facts we recite here are recited in the light most favorable to the Mohameds.

[2] Section 664 of the Code (unless otherwise indicated, all section references
(continued...)

Mohameds intended that whatever was left in the Trust after their deaths would go to the Shriners Hospitals for Children, the Sacramento Food Bank & Family Services, and the Pacific Legal Foundation.

In 2003 the Mohameds donated five properties worth millions of dollars to the Trust. Four of the properties were on the same street corner in Rio Linda, California, a city just north of Sacramento (Rio Linda properties); the other one was 40 acres of subdivided land on Calvine Road south of Sacramento (Calvine Road property). Joseph filled out the 2003 tax return himself, including the Form 8283, Noncash Charitable Contributions. He admits that he did not read the instructions before completing the form, because he says it seemed so clear that he didn't think he needed to even though, in fairness to the Commissioner, the form does say right at the top and center: "See separate instructions." It's easy to see why Joseph thought so: The form says that section B, part I (the description of the donated properties) could be "completed by the taxpayer and/or appraiser." It also notes that "If your total art contribution deduction was $20,000 or more you must

---

²(...continued)
are to the Internal Revenue Code in effect for the years at issue, and Rule references are to the Tax Court Rules of Practice and Procedure) requires at least annual payments of a specified percentage of the fair market value of the trust assets to a beneficiary, followed by payment of the remaining trust corpus to a charity. If the CRUT meets all the regulatory requirements, the taxpayer may take a charitable deduction equal to the value of the charitable remainder in the year he creates the trust. See sec. 1.170A-6(b)(1)(iii), Income Tax Regs.

attach a complete copy of the signed appraisal. See instructions." The Mohameds were not donating art; they were donating real estate. Nowhere else on the form did it indicate that a taxpayer had to attach an appraisal.

Joseph left blank section A, meant for donations worth less than $5,000. In section B, the Appraisal Summary, he used his own appraisals of the parcels, reporting that he had donated "4 parcels of land, 2 with improvements," worth $1,010,388, and a "40 acre parcel of vacant land," worth $14,873,921. He didn't report his basis, but stated that he had bought all the properties in the 1970s and 1980s. Joseph claimed deductions of $229,196 for the Rio Linda properties and $3,629,534 for the Calvine Road property, carrying forward the rest of the charitable deduction.[3] He left blank the Declaration of Appraiser because it stated, "I declare that I am not the donor, the donee, a party to the transaction," and Joseph recognized that he was the donor (and the donee, since he was trustee of the Trust). But he did sign the Donee Acknowledgment saying that the Trust was a qualified

---

[3] A taxpayer may deduct donations of up to 50% of his "contribution base"-- his adjusted gross income without regard to carryover losses from other years. Sec. 170(b)(1). If a taxpayer makes donations of more than 50% of his contribution base, he can carry over his leftover deduction to the next five years' tax returns. Sec. 170(d)(1). A dispute over a large charitable deduction can thus affect a number of tax years--issue was joined in a third case, arising from the Mohameds' 2005 return, only last year. All three years are now before this division of the Court.

organization under section 170(c) (governing which organizations qualify as charities) and that the Trust had actually received the claimed donations.

He also attached two statements[4] to the tax return. The first was a document titled "Statement of Explanation for Entry on Line 6 of Schedule A." This gave the addresses of the properties, more detailed descriptions of their size and improvements, and values for each of the four Rio Linda properties. It also showed that the total value of the Calvine Road property was more than $15 million. The second one, titled "Appraised Market Values," elaborated on the Calvine Road appraisal, and itemized some of the expenses related to its improvement. Joseph signed the second document, and under his signature indicated that his title was "Real Estate Broker/Appraiser." He says he claimed a lower value on the Form 8283 than he thought might be justified because he didn't want to risk overvaluing the property.

In 2004 the Mohameds donated a shopping center in Elk Grove, California, a town southeast of Sacramento, to the Trust. Joseph again filled out the 2004 return (which had the same ambiguous references to appraisals) himself, and again did not read the instructions. On his 2004 Form 8283, Joseph wrote the address of the

---

[4] There is some dispute about whether he attached the second one. See infra note 9.

shopping mall and valued it at $2 million. He wrote "statement attached" in the boxes marked "Date acquired by donor" and "How acquired by donor," but left blank the box where he should have written his basis. He claimed a $488,040 deduction for 2004. He again didn't sign the declaration, but did sign the donee acknowledgment on behalf of the Trust.

He submitted the attached statement on the letterhead of Joseph Mohamed Enterprises, which had the uppercase-R "realtor" logo on it. It said only: "2004 Form 8283, Section B, Part 1, Line 5-A, column d: The donor purchased the land in August 1969, and then completed building the shopping center in September 1977. This property is known as 9738-9756 Elk Grove-Florin Rd., Elk Grove, CA." His statement gave no appraisal information, and he did not sign it.

Joseph prepared another statement for the shopping center that looked much like the one he attached to his 2003 return. This one listed the income and expenses from the shopping center and used a 6.5% "cap rate" to compute a market value of $2,642,190.62. Joseph signed this statement, but listed his job title as "Owner and Licensed Real Estate Broker." Joseph says he attached this to his 2004 tax return, but the Commissioner says he didn't get it until sometime in 2006 after the audit.

The Commissioner started an audit of the 2003 return in April 2005, and was displeased at Joseph's self-appraisal of such high-dollar properties. So the Mohameds hired Woodrow Stephen Bowman to perform an independent appraisal of the Rio Linda properties and the Calvine Road property, and hired Robert R. Keeling to appraise the Elk Grove shopping center. The independent appraisals were similar, but not identical, to Mohamed's own:

| Property | Mohamed appraisal | Independent appraisal |
|---|---|---|
| Rio Linda 1 | $296,348.00 | $296,000 |
| Rio Linda 2 | 325,000.00 | 315,000 |
| Rio Linda 3 | 125,000.00 | 140,000 |
| Rio Linda 4 | 264,040.00 | 220,000 |
| Calvine Road | 14,873,921.00 | 16,380,000 |
| Shopping center | 2,642,190.62 | 2,926,246 |
| Total: | 18,526,499.62 | 20,277,246 |

After the Mohameds transferred the properties, the Trust sold some of them in arm's-length deals. Rio Linda parcel 3 sold for $125,000 in May 2003. Rio Linda parcel 4 sold for $265,000 in October 2003. The shopping center sold in April 2004 for $2,280,000. And by the end of 2004 the Calvine Road property was sold in two pieces for a total price of nearly $23 million.

Despite the relative consistency between the appraisals and the ultimate sale prices, the Commissioner thought the Mohameds had overstated the values of the properties, and these cases seemed set to become valuation battles. But then the Commissioner realized that the Mohameds had made several mistakes in filing their Forms 8283 for 2003 and 2004, and amended his answer to assert that these mistakes compel denying the Mohameds any charitable deductions for their CRUT at all. He also moved for partial summary judgment in both cases to settle this issue.[5]

## Discussion

Summary judgment is appropriate when there is no genuine issue of material fact and a decision may be rendered as a matter of law. Rule 121(b). The moving party bears the burden of proving that there is no genuine issue of material fact, and we make any factual inferences in favor of the nonmoving party. Fla. Country Clubs, Inc. v. Commissioner, 122 T.C. 73, 76 (2004), aff'd, 404 F.3d 1291 (11th Cir. 2005). But when the moving party adequately supports his motion for summary judgment with admissible evidence, the nonmoving party can't just deny it, but must recite specific facts showing that there really is a genuine factual

---

[5] The Commissioner also has retained his alternative argument about valuation. The notices of deficiency include several changes unrelated to the charitable deduction that are not at issue on these motions.

issue for trial. Rule 121(d). Although there are some disputes between the parties about factual issues, none of them turn out to be material to whether the Mohameds should lose all of their deductions for failure to comply with the regulations.

I.      Section 170 and Accompanying Regulations

Section 170 governs the deductibility of charitable donations, and states that "A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary." Sec. 170(a)(1).[6] The regulations in 2003 and 2004 had extensive requirements for substantiation of charitable deductions greater than $5,000. Sec. 1.170A-13(c), Income Tax Regs. Those regulations say "No deduction under section 170 shall be allowed with respect to a charitable contribution * * * unless the substantiation requirements described in paragraph (c)(2) of this section are met." Sec. 1.170A-13(c)(1)(i), Income Tax Regs. Paragraph (c)(2) of section 1.170A-13, Income Tax Regs., reads:

---

[6] In 2004, Congress added section 170(f)(11)(C) and (D), which requires the taxpayer to get a "qualified appraisal" for any donation worth $5,000 or more and attach that appraisal to his tax return for every donation of property worth $500,000 or more. American Jobs Creation Act of 2004, Pub. L. No. 108-357, sec. 883(a), 118 Stat. at 1631. But that section applies only to contributions made after June 3, 2004--the parties don't dispute that all of the Mohameds' transfers occurred before that section became effective.

(2) Substantiation requirements--(i) In general.--Except as provided in paragraph (c)(2)(ii) of this section, a donor who claims or reports a deduction with respect to a charitable contribution to which this paragraph (c) applies must comply with the following three requirements:

(A) Obtain a qualified appraisal (as defined in paragraph (c)(3) of this section) for such property contributed.  If the contributed property is a partial interest, the appraisal shall be of the partial interest.

(B) Attach a fully completed appraisal summary (as defined in paragraph (c)(4) of this section) to the tax return * * * on which the deduction for the contribution is first claimed (or reported) by the donor.

(C) Maintain records containing the information required by paragraph (b)(2)(ii) of this section.

The regulations further define what constitutes a "qualified appraisal."  A qualified appraisal must be made no more than 60 days before the gift and no later than the due date of the return,[7] must be signed by a qualified appraiser, must include specific information (such as a description of the property and certain disclosures by the appraiser), and must not involve a prohibited fee.  Sec. 1.170A-13(c)(3)(i), Income Tax Regs.  The most important requirement is that the appraisal be done by a qualified appraiser, see sec. 1.170A-13(c)(3)(i)(B), Income Tax Regs.,

---

[7] Or, in the case of a deduction first claimed on an amended return, the qualified appraisal must occur no later than the date the taxpayer files the amended return.  Sec. 1.170A-13(c)(3)(i), (iv)(B), Income Tax Regs.

which the regulations say cannot be the donor or taxpayer claiming the deduction or the donee of the property, sec. 1.170A-13(c)(5)(iv)(A), (C), Income Tax Regs. Joseph, who did the appraisals, was the donor and the taxpayer claiming the deductions. He was also, in his capacity as the trustee of the Trust, the donee. There is no way we can possibly find that he was a qualified appraiser for the gifts.

The Mohameds also have a second problem. Neither section B of the Form 8283 nor Joseph's attached statement qualifies as an appraisal summary. Section 1.170A-13(c)(4), Income Tax Regs., tells us what qualifies as an appraisal summary. One of the threshold requirements is that it be signed by the qualified appraiser who prepared the appraisal. Sec. 1.170A-13(c)(4)(i)(C), Income Tax Regs. Section 1.170A-13(c)(4)(ii), Income Tax Regs., says the summary also must include the following information:

- the name and Social Security number of the donor;

- a description of the property;

- a brief summary of the overall physical condition of tangible property;

- the manner and date of the donor's acquisition of the property;

- the cost or other basis;

- the name, address, and taxpayer identification number of the donee;

- the date the donee received the property;

- a statement about whether the contribution was made by bargain sale;

- the name, address, and identification number of the qualified appraiser;

- the appraised fair market value of the property;

- a declaration by the appraiser that he is an appraiser, with sufficient qualifications to make this appraisal, and not one of the people unable to be a qualified appraiser; and

- a statement by the appraiser that the fee charged was not of a prohibited type, and that the appraiser has not been barred from presenting appraisals to the IRS under 31 U.S.C. section 330(c).

Joseph failed to include information about several of these categories on his Forms 8283 and the attached statements. For instance, he didn't include his bases in the properties, there is no bargain-sale statement, and there are no statements from a qualified appraiser. In fact, the statements Joseph attached to the Forms 8283 don't indicate that they are appraisals at all. If Joseph had hired a qualified appraiser, the lack of appraisal summaries might not have been a problem--section 1.170A-13(c)(4)(iv)(H), Income Tax Regs., says that if a donor forgets to attach the appraisal summary, the IRS can request it and the taxpayer can still get the deduction if he submits the summary within 90 days of the request. But the

underlying appraisal still has to be a qualified appraisal completed before the due date of the tax return, and the appraisal summary must still contain the information required by section 1.170A-13(c)(4)(ii), Income Tax Regs. Sec. 1.170A-13(c)(4)(iv)(H), Income Tax Regs. Since Joseph didn't seek an independent appraisal until after the audits started (well after his returns were due), he can't even find refuge in this section.

We must conclude that there is no dispute that Joseph didn't follow the regulations. His appraisals weren't qualified because he did them himself, his attached statements weren't appraisal summaries, and his untimely independent appraisals came too late to be either qualified appraisals or remedial appraisal summaries. This means the Commissioner has to win unless we hold that the regulations are invalid, or unless we find that Joseph has raised a genuine dispute that he substantially complied with the regulations, or we find some legal merit in the peculiar problems that he points to in the appraisal form itself.

II.     The Validity of the Regulations

The Mohameds challenge the validity of the regulations, claiming they disallow deductions for verified and substantiated donations, whereas the statute permits the Secretary to disallow only unverified donations. They claim this is arbitrary and capricious because it lets a taxpayer keep some of the deduction if he

follows the procedure but overvalues his donation, but takes away the entire

deduction of the taxpayer who accurately values his donation but fails to follow the

procedure.[8]

Section 170(a)(1) reads, "A charitable contribution shall be allowable as a

deduction only if verified under regulations prescribed by the Secretary."  This

language is an "express delegation of authority" to create rules about how a

donation will be verified.  See Chevron, U.S.A., Inc. v. Natural Res. Def. Council,

467 U.S. 837, 843-44 (1984); see also Mayo Found. for Med. Educ. & Research v.

United States, 562 U.S. ___, 131 S. Ct. 704, 714 (2011).  We can't invalidate

regulations unless they are arbitrary, capricious, or manifestly contrary to the

statute.  Chevron, 467 U.S. at 844.  We are also constrained in these cases by the

Deficit Reduction Act of 1984 (DEFRA), Pub. L. No. 98-369, sec. 155, 98 Stat. at

691.  DEFRA section 155 commanded the Secretary to issue regulations under

section 170(a)(1) to require taxpayers to get a qualified appraisal and attach an

---

[8] We don't summarize the Commissioner's arguments about the validity of the regulations under Chevron, U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837 (1984).  That's because he didn't make any, either in his January 2009 Memorandum in support of motion for partial summary judgment in the 2003 case (at which point he admittedly may not have known of the Mohameds' Chevron arguments, which were made in a March 2009 filing) or in his June 2009 Memorandum in support of motion for partial summary judgment in the 2004 case (when he should have been on notice of the Mohameds' arguments).

appraisal summary to the first return on which the deduction is claimed for all donations of property for which the claimed value exceeds $5,000. DEFRA sec. 155(a)(1) and (2).

Under Chevron, we first ask whether Congress has directly spoken to the precise question at issue. Chevron, 467 U.S. at 842-43. If the answer is yes, we must give effect to congressional intent. Id. If the answer is no, we don't replace the agency's interpretation with our own. Instead, we allow the agency interpretation to stand if it "is based on a permissible construction of the statute." Id. at 843.

The Mohameds first disagree with the Commissioner's interpretation of the word "verified" in the regulation. They think the regulation is disallowing some deductions the Code allows--namely those that have been "verified" according to section 170, even though they don't meet the Commissioner's verification rules. The Ninth Circuit has said: "[A] claimant must make a compelling argument, based on the language and history of the statute itself, that Congress can only have intended one meaning to attach to that language before we will find that the administering agency has no authority to employ a different construction." Redlark v. Commissioner, 141 F.3d 936, 940 (9th Cir. 1998), rev'g 106 T.C. 31 (1996).

Although no courts have directly addressed whether section 1.170A-13, Income Tax Regs., fails the Chevron test, several courts have noted its "legislative history"--an odd concept, because regulations usually don't come from Congress. But courts have analyzed the interplay between DEFRA section 155 (in some sense a congressional interpretation of section 170(a)(1)), and the provisions in section 1.170A-13, Income Tax Regs. (which was the result of DEFRA). See Hewitt v. Commissioner, 109 T.C. 258 (1997), aff'd without published opinion, 166 F.3d 332 (4th Cir. 1998). DEFRA is, after all, another law that we and the Secretary must follow, and it shows a clear congressional intent that contributions over $5,000 be verified via appraisal by a qualified appraiser to be deductible. DEFRA sec. 155(a). DEFRA section 155 also commands that the appraiser be someone other than the taxpayer or the donee. DEFRA sec. 155(a)(5)(A)(i), (iii). Therefore, we find that Congress has enacted one specific meaning of the term "verified" and the regulation accurately reflects that meaning.

Because the regulation matches the congressional definition, that should be "the end of the matter." But just in case the term "verified" was open to interpretation by the Commissioner, we proceed under Chevron step two to the question of whether his regulation was a permissible construction of the statute.

The Commissioner's regulation sets out a complicated way of verifying noncash donations worth more than $5,000. Taxpayers must hire an independent qualified appraiser, get a written appraisal document, and attach an appraisal summary with signed statements and detailed information to their tax return. We are also mindful of the apparent injustice the Mohameds point out on brief--some taxpayers who overvalue their property will still get a deduction, while others who accurately value their property may lose the entire deduction if they don't follow the regulation. But the Commissioner helpfully provided section 1.170A-13(c)(4)(iv)(H), Income Tax Regs., allowing a taxpayer who gets a qualified appraisal but doesn't follow the exact letter of the regulation to fix his mistake.

The essence of the regulation, and of DEFRA section 155, therefore, is that "verification" of a donation must be done by a qualified appraiser, and the rest of the rules are administrative means of conveying that appraiser's qualifications, honesty, and opinion on the matter to the IRS. The Commissioner's interpretation of "verified" is therefore something along the lines of "valued and documented by an independent appraiser." This serves the valuable government purpose of preventing tax evasion, both by overvaluation (Joseph's concern) and by undervaluation. See, e.g., Estate of Christiansen v. Commissioner, 130 T.C. 1, 16-17 (2008), aff'd, 586 F.3d 1061 (8th Cir. 2009). This is not arbitrary or capricious--

because the regulation matches the congressional interpretation in DEFRA section 155, the regulation is presumptively a permissible interpretation of the statute. The regulation is also "consistent with the statute's prescription," in this case to prescribe the form of the verification. Estate of Clause v. Commissioner, 122 T.C. 115, 120 (2004).

III.   Substantial Compliance

The Mohameds argue that even if the regulation is valid, and even if they didn't strictly comply with the regulation, they should still get deductions because they substantially complied. They draw their argument from a line of cases starting with Bond v. Commissioner, 100 T.C. 32 (1993), in which the taxpayers donated two blimps to charity. They hired an appraiser, who filled out the relevant parts of the appraisal summary in section B of the Form 8283, but left out his qualifications. Id. at 33-34. He later provided a list of his qualifications--which were excellent--at the beginning of the audit. Id. at 34-35. We found that the requirements of section 1.170A-13, Income Tax Regs., were directory rather than mandatory, and the Bonds had substantially complied because:

> [The] petitioners * * * met all of the elements required to establish the substance or essence of a charitable contribution, but merely failed to obtain and attach to their return a separate written appraisal * * * even though substantially all of the specified information except the

qualifications of the appraiser appeared in the Form 8283 attached to the return. * * * [Id. at 41-42.]

Since Bond, few taxpayers have succeeded in showing substantial compliance.

Their fatal mistakes have included:

- Failing to get an appraisal. See Todd v. Commissioner, 118 T.C. 334, 336, 347 (2002); Hewitt, 109 T.C. at 260, 264; Jorgenson v. Commissioner, T.C. Memo. 2000-38, 2000 Tax Ct. Memo LEXIS 38, at *25-*26.

- Failing to fill out section B of Form 8283 (the appraisal summary). See Hewitt, 109 T.C. at 260, 264; Smith v. Commissioner, T.C. Memo. 2007-368, 2007 Tax Ct. Memo LEXIS 387, at *51, aff'd, 364 Fed. Appx. 317 (9th Cir. 2009).

- Having someone without expertise in appraisals complete the appraisal, see Smith, 2007 Tax Ct. Memo LEXIS, at *48 (CPA wasn't licensed appraiser); D'Arcangelo v. Commissioner, T.C. Memo. 1994-572, 1994 Tax Ct. Memo LEXIS 575, at *24 (high-school principal not qualified to appraise art supplies, and was employee of donee and therefore ineligible to be qualified appraiser).

- Having an appraisal prepared at the wrong time (i.e., either more than 60 days before the gift or after the return was filed), see Jorgenson, 2000 Tax Ct. Memo LEXIS 38, at *13, *25-*26 (appraisal prepared after tax return filed); D'Arcangelo v. Commissioner, 1994 Tax Ct. Memo LEXIS 575, at *28-*29 (appraisal at least six years before gift); see also Fehrs Fin. Co. v. Commissioner, 487 F.2d 184, 189 (8th Cir. 1973) (in case about complete redemption of stock, taxpayers provided statutorily required agreement to IRS only after adverse decision by Tax Court), aff'g 58 T.C. 174 (1972); Friedman v. Commissioner, T.C. Memo. 2010-45, 2010 Tax Ct. Memo LEXIS 46, at *11 (appraisals performed years after due dates of returns).

- Including insufficient information or inappropriate information in an appraisal or appraisal summary, see Smith, 2007 Tax Ct. Memo LEXIS 387, at \*48 (appraisal of partnership shares "terse" and appraisal actually of assets held by partnership, not the shares themselves).

The cases make clear that substantial compliance requires a qualified appraisal. "Such a requirement is statutorily imposed by [DEFRA] section 155(a)(1)(A), and its impact is reflected in the legislative history of that provision." Hewitt, 109 T.C. at 264; see also Scheidelman v. Commissioner, T.C. Memo. 2010-151, 2010 Tax Ct. Memo LEXIS 186, at \*32; Friedman, 2010 Tax Ct. Memo LEXIS 46, at \*8. Hewitt quotes a House conference report stating:

> [N]o deduction is allowed for a contribution of property for which an appraisal is required under the conference agreement unless the appraisal requirements are satisfied.
>
> \* \* \* \* \* \* \*
>
> For donations of property as to which the donor appraisal requirements apply, the donor must obtain and retain a qualified written appraisal by a qualified appraiser for the property contributed and must attach a signed appraisal summary to the return on which the deduction is first claimed (with such other information as prescribed by regulations). [H.R. Conf. Rept. No. 98-861, at 995-96 (1984), 1984-3 C.B. (Vol. 2) 1, 249-50.]

This follows the related line of reasoning that a taxpayer can't substantially comply if he fails to comply with an "essential requirement" of the governing statute. Estate of Clause, 122 T.C. at 122. Since it is an "essential requirement" of section

170(a)(1) and DEFRA section 155 that the taxpayer obtain a qualified appraisal, we can't excuse failure to do so as substantial compliance.

The Mohameds made several of their own mistakes. The question we must answer is whether the mistakes they made are of the insignificant Bond variety or are fatal to their argument. Because each set of properties presents different facts, we address them individually.

A.    Rio Linda Properties

On the Mohameds' 2003 Form 8283, section B, Joseph described the Rio Linda properties as "4 parcels of land, 2 with improvements." He noted the date he bought them, but didn't write down his bases. Part III, Declaration of Appraiser, was left blank. The attachment gave more specific information about the four properties, listing an address, acreage, and improvements on the properties. But the attachment wasn't labeled an appraisal, and nothing on the form suggested that the values Joseph was claiming for the Rio Linda properties were appraised values. He didn't sign this statement, and he didn't state that he had come up with the values himself or note what method he used to calculate them. There is no dispute that Joseph was not a qualified appraiser under the regulations, since he was both the donor and trustee for the donee. The attachment to the Form 8283, therefore, cannot be a qualified appraisal. Its fatal flaws include its preparation by an

ineligible appraiser (like the donee/high-school principal from D'Arcangelo) and its lack of enough detailed information to put the Commissioner on notice of the nature of the donation (like the appraisal in Smith).

The appraisals by Woodward Stephen Bowman--who we will assume is a qualified appraiser for purposes of Commissioner's summary-judgment motion-- were prepared on October 10, 2005--more than a year and a half after the April 15, 2004, due date for the 2003 tax return.  These can't be qualified appraisals either. And late appraisals do not substantially comply with the regulations.  See Jorgenson, 2000 Tax Ct. Memo. LEXIS 38, at *25-*26.  The Mohameds' failure to hire a qualified appraiser before filing their 2003 tax return, and their failure to provide sufficient information to put the Commissioner on notice of the nature of the appraisal for the Rio Linda properties, means they can't take any deduction for their contribution of the Rio Linda properties.

B.    Calvine Road Property

Although the Form 8283 had the same problems for the Calvine Road property as it did for the Rio Linda properties, Joseph provided more information for Calvine Road in an attached statement titled "Appraised Market Values on

Shirley Medeiros Mohamed Acres Subdivision."[9]  The title suggests that these values have been appraised, and says the values are "based on current offers."  It's dated March 23, 2003, which puts it within the acceptable time range.  But it's signed by Joseph, and again doesn't indicate that he acted as the appraiser.  Joseph admits in his affidavit, however, that he prepared it based on his own appraisal of the property--but a taxpayer can't be his own qualified appraiser, so this form doesn't qualify for substantial compliance.

Woodward Stephen Bowman prepared his appraisal on October 11, 2005-- after the due date for the tax return.   Giving the Commissioner a tardily prepared appraisal no more substantially complies with the regulation for the Calvine Road property than it did for the Rio Linda properties.  The Mohameds therefore cannot take a deduction for their donation of the Calvine Road property.

C.    Elk Grove Shopping Center

Joseph again made several mistakes in filling out the Form 8283, and included an unsigned attachment with no appraisal information at all.  He says he included an additional appraisal statement dated December 31, 2003, but he

---

[9] Joseph says he included the attachment with additional information about the Calvine Road property with his Form 8283.  The Commissioner says he did not, but in a summary-judgment motion, we view the facts in the light most favorable to the nonmoving party.

himself prepared that appraisal statement, which means it can't be a qualified appraisal.

As with the other properties, the Mohameds hired an independent appraiser to try to verify the value of their donation. The "appraisal" of the shopping center by Robert Keeling is dated December 20, 2005, eight months after the return was due and filed. But even without this fatal tardiness, we would place very little weight on it--Keeling wrote to Joseph, "My valuation is per your instructions," and indicates that most of his information about the site came from his discussions with Joseph, rather than from an independent analysis of the market and the property. He also included a disclaimer at the end of his letter saying: "Appraisal Departures from a full appraisal, which ordinarily includes a cost and sales approach, were necessary to satisfy the clients instructions to give a valuation as determined by the income from the property." And the letter doesn't include any of his qualifications other than his appraiser-license number, or any of the statements about fees and prohibited relationships required by the regulations. Keeling's letter neither meets the strict requirements of DEFRA section 155 and the regulations, nor does it substantially comply with them. The Mohameds can't take any deduction for the Elk Grove shopping mall.

IV.    Form 8283

The Mohameds make one last-ditch effort to save their deductions. They point out that the Commissioner's Form 8283 for 2003 and 2004 didn't indicate anywhere on it that a taxpayer had to get an independent appraisal for contributions worth more than $5,000 and presented conflicting messages about what could be filled out by the taxpayer and what required an appraiser's signature. We won't try to explain away these difficulties, and note that the Commissioner has since changed his form to reduce confusion. Although sympathetic to the Mohameds' cause, we can't hold the form's failings against the Commissioner here, because "the authoritative sources of Federal tax law are in the statutes, regulations, and judicial decisions and not in such informal publications." Zimmerman v. Commissioner, 71 T.C. 367, 371 (1978), aff'd without published opinion, 614 F.2d 1294 (2d Cir. 1979); see also Miller v. Commissioner, 114 T.C. 184, 194-95 (2000), aff'd sub nom. Lovejoy v. Commissioner, 293 F.3d 1208 (10th Cir. 2002); Seely v. Commissioner, T.C. Memo. 1986-216, 1986 Tax Ct. Memo LEXIS 390, at *15-*16. A taxpayer relies on his private interpretation of a tax form at his own risk. Accordingly, we hold that the Mohameds are not entitled to any charitable deduction for 2003 or 2004.

We recognize that this result is harsh--a complete denial of charitable deductions to a couple that did not overvalue, and may well have *undervalued*, their contributions--all reported on forms that even to the Court's eyes seemed likely to mislead someone who didn't read the instructions.  But the problems of misvalued property are so great that Congress was quite specific about what the charitably inclined have to do to defend their deductions, and we cannot in a single sympathetic case undermine those rules.

<u>Appropriate orders will be issued</u>.